**J.E. PIERCE APOTHECARY, INC.,** Sutherland Pharmacy, Inc., and Medfield Pharmacy, Inc. and Meetinghouse Community Pharmacy, Inc. on behalf of itself and a class of similarly situated entities Plaintiffs,

v.

**HARVARD PILGRIM HEALTH CARE, INC.,** Health New England, Inc., CVS Corporation, PharmaCare Management Services, Inc. Defendants.

No. CIV.A.98–12635–WGY.

United States District Court,
D. Massachusetts.

March 31, 2005.

David A.P. Brower, Milberg Weiss Bershad & Schulman LLP, New York City, NY, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Jeffrey D. Clements, Clements & Clements LLP, Boston, for PharmaCare Management Services, Inc., CVS Corporation, Defendants.

William M. Cowan, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, for CVS Corporation, Defendant.

Steven M. Cowley, Edwards & Angell, LLP, Boston, for PharmaCare Management Services, Inc., Defendant.

Alan P. Danovitch, Boston, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Francis D. Dibble, Jr., Bulkley, Richardson & Gelinas, Springfield, for Health New England, Inc., Defendant.

Ruth T. Dowling, Palmer & Dodge, LLP, Boston, for Harvard Pilgrim, Defendant.

Madeleine A. Estabrook, Edwards & Angell, LLP, Boston, for PharmaCare Management Services, Inc., Defendant.

Michael S. Gardener, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, for CVS Corporation, PharmaCare Management Services, Inc., Defendants.

John C. Kane, Ropes & Gray LLP, Boston, for Harvard Pilgrim, Defendant.

Alan L. Kovacs, Law Office of Alan L. Kovacs, Boston, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Elaine S. Kusel, Milberg, Weiss, Bershad Specthrie & Lerach, New York, NY, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Kevin M. McGinty, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, for

PharmaCare Management Services, Inc., CVS Corporation, Defendants.

Andrew Nathanson, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, for CVS Corporation, Defendant.

William L. Patton, Ropes & Gray, LLP, Boston, for Harvard Pilgrim, Defendant.

Albert Powell, Milberg, Weiss, Bershad & Schulman, New York, NY, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Eugene R. Richard, Wayne, Richard & Hurwitz, LLP, Boston, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Katherine A. Robertson, Bulkley, Richardson & Gelinas, Springfield, for Health New England, Inc., Defendant.

Thane D. Scott, Palmer & Dodge, LLP, Boston, for Harvard Pilgrim, Defendant.

J. Michael Scully, Bulkley, Richardson & Gelinas, Springfield, for Health New England, Inc., Defendant.

Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Washington, DC, for PharmaCare Management Services, Inc., CVS Corporation, Defendants.

Howard Wayne, Wayne, Richard, & Hurwitz, Boston, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Barry A. Weprin, Milberg, Weiss, Bershad & Schulman LLP, New York, NY, for J.E. Pierce Apothecary, Inc., Medfield Pharmacy, Inc., Meetinghouse Community Pharmacy, Inc., Sutherland Pharmacy, Inc., Plaintiffs.

Jane E. Willis, Ropes & Gray, Boston, for Harvard Pilgrim, Defendant.

## MEMORANDUM AND ORDER

"If everybody keeps doing what they're doing, we will probably never get our arms around the medical expense trend."

Charles Baker, CEO Harvard Pilgrim Healthcare, Inc., March 11, 2005 [1]

YOUNG, Chief Judge.

We Americans spend $200,000,000,000.00 on prescription drugs per year. David S. Nalven, *Prescription Drug Litigation: Seeking Reform through the Courts*, 49 Boston Bar J., Jan./Feb.2005, 18 (2005). As a result, courts are seeing a rise in cases challenging the pharmaceutical industry's practices in the pricing, development, and mass marketing of pharmaceuticals.[2] *Id.* This case, however, arises from equally important activities further down the pharmaceutical distribution chain. Pharmacies, insurance companies, and other organizations concerned with providing medical care must necessarily balance quality and cost to the consumers and still remain profitable in order to ensure sustainability. Moreover, the government and the market interact in balancing oft competing needs, implicating in turn the tension between totally free markets and concerns for fair and open dealing in markets between actors with vastly disparate bargaining power.

1. Speaking to a breakfast meeting of Associated Industries of Massachusetts, Baker "told executives they need to get employees involved in their medical spending decisions. He urged [executives] to offer plans with high deductibles or adopt other measures that induce [employees to accept such health insurance plans]." Kimberly Blanton, *Harvard Pilgrim CEO Urges Firms to Change*, The Boston Globe, Mar. 12, 2005, at El.

2. In one such case alleging antitrust violations to delay lower priced generic drugs coming to market, GlaxoSmithKline became

## I. PRIOR PROCEEDINGS

J.E. Pierce Apothecary, Inc. ("J.E.Pierce"), Sutherland Pharmacy, Inc. ("Sutherland Pharmacy"), Meetinghouse Community Pharmacy, Inc. ("Meetinghouse Pharmacy"), and Medfield Pharmacy, Inc. ("Medfield Pharmacy") (collectively, "the Independent Pharmacies") filed this case on behalf of themselves and other similarly situated entities on December 30, 1998, against Harvard Pilgrim Health Care, Inc. ("Harvard Pilgrim"), CVS Corporation ("CVS"), and PharmaCare Management Services, Inc. ("PharmaCare")(collectively, "the Defendants").[3] In their complaint, they allege that the Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, the Massachusetts Any Willing Provider Law, Mass. Gen. Laws ch. 176D § 3B, and the Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 11. Compl. [Doc. No. 1].

In March 2000, the Court dismissed the claim under the Any Willing Provider Law, since it did not give rise to a private cause of action, Order on Defs.' Joint Mot. to Dismiss, March 6, 2000 [Doc. No. 36], but allowed the Independent Pharmacies to pursue the class claim pursuant to Mass. Gen. Laws chapter 93A, § 11. *Id.* The litigation was stayed for a limited time in 2000 while Harvard Pilgrim was in receivership. After the litigation resumed, the

so upset with a decision of this Court—*In re Relafen Antitrust Litig.*, 346 F.Supp.2d 349 (D.Mass.2004)—that it had the breathtaking hutzpa to petition for mandamus to have the decision vacated and apparently expunged. The petition was later withdrawn when the Court simply reissued the original decision. *In re Relafen*, 360 F.Supp.2d 166 (D.Mass. 2005).

3. Health New England, Inc. was one of the original defendants; however, as it was subsequently dismissed, it is not included in the collectively defined term "the Defendants."

parties conducted discovery on the issue of class certification. Defs.' Mem. in Supp. of Summ. J. at 6 [Doc. No. 160] ("Defs.' Mem.").

The Court certified a class pursuant to Fed.R.Civ.P. 23(b)(3) on September 30, 2002, defining that class as:

All Massachusetts pharmacies other than defendant CVS, which operate within the geographic market serviced by defendant Harvard Pilgrim, and which, from March 17, 1998 through present, have been a party, along with defendant PharmaCare, to a Managed Care Pharmacy Participation Agreement related to the provision of prescription drugs to Harvard Pilgrim Subscribers from and after March 17, 1998.

Order on Class Certification[4] ¶ 2 [Doc. No. 106].

In so certifying, the Court rejected class claims relating to the restricted pharmacy network prior to March 17, 1998, as well as claims against Health New England, Inc. ("Health New England"). *See id.* Following the certification, the parties conducted discovery on the merits of the claim. Defs.' Mem. at 6.

On February 5, 2003, the parties stipulated to the dismissal of claims against Health New England, as there was no plaintiff within the class in the area serviced by Health New England. Stipulation of Dismissal [Doc. No. 110].

Upon the completion of discovery, both sides moved for summary judgment. Following a scheduling conference held on July 29, 2004, both sides agreed to treat their cross motions for summary judgment as a "case-stated." Joint Mot. for Order to Authorize a Case Stated [Doc. No. 188].

On August 25, 2004, in light of recent case law, the Court dismissed the Antitrust Claim without prejudice to any member of the class (other than the named plaintiffs). Electronic Order of Aug. 25, 2004. Thus, the only remaining claim alleges that the Defendants violated the Any Willing Provider Law, thereby violating Mass. Gen. Laws chapter 93A § 11, in the design and implementation of the Harvard Pilgrim pharmacy network.

In agreeing to treat the issue as a "case stated," the parties have agreed that the record presently before the Court constitutes the entire evidentiary record and the Court may draw reasonable inferences therefrom in applying the law. This practical procedural vehicle is expressly approved by the First Circuit, *Continental Grain Co. v. Puerto Rico Mar. Shipping Auth.*, 972 F.2d 426, 429 n. 7 (1st Cir.1992) (observing that the submission of a matter to the court as a case stated promotes judicial efficiency); *Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 11–12 (1st Cir. 1985) (Breyer, J.), and is frequently utilized by this Court upon the parties' consent. *See Radford Trust v. First Unum Life Ins. Co. of Am.*, 321 F.Supp.2d 226 (D.Mass.2004); *Cosme v. Salvation Army*, 284 F.Supp.2d 229 (D.Mass.2003); *Rymes Heating Oils, Inc. v. Springfield Terminal Ry., Inc.*, 265 F.Supp.2d 147 (D.Mass. 2003); *Laurenzano v. Blue Cross & Blue Shield of Mass., Inc.*, 191 F.Supp.2d 223 (D.Mass.2002); *Watson v. Deaconess Waltham Hosp.*, 141 F.Supp.2d 145 (D.Mass. 2001); *Stein v. United States*, 135 F.Supp.2d 265 (D.Mass.2001); *Cabral v. St. Paul Fire & Marine Ins. Co.*, 59 F.Supp.2d 190 (D.Mass.1999); *United Cos. Lending Corp. v. Sargeant*, 20 F.Supp.2d.

---

4. In certifying the class as those that joined the network, it is to be noted that individual plaintiffs J.E. Pierce, Sutherland Pharmacy, and Medfield Pharmacy are not members of the class.

192 (D.Mass.1998); *Williams v. Hanover Hous. Auth.*, 871 F.Supp. 527 (D.Mass. 1994).

This Court afforded the parties extended oral argument on October 20, 2004, Tr. of Hr'g of Oct. 20, 2004 [Doc. No. 201], and took the case under advisement.

## II. FINDINGS OF FACT

The facts in this case can be found in several documents: (i) Defs.' Statement of Undisputed Material Facts [Doc. No. 150] ("Defs.' 56.1 Stmt."); (ii) Pls.' response thereto [Doc. No. 174] ("Pls.' 56.1 Resp."); (iii) Pls.' Statement of Undisputed Material Facts [Doc. No. 168] ("Pls.' 56.1 Stmt."); (iv) Defs.' response thereto [Doc. No. 178] ("Defs.' 56.1 Resp."); and (v) written documents and exhibits, as compiled in the parties' Appendices [Doc. Nos. 166, 169, 170, 171, 176, 177].

### A. Description of the Industry

The pharmaceutical industry is made up of many parties, some familiar to the general public, some not so familiar. These entities are connected by complex and sometimes confusing financial arrangements. This section describes pharmaceutical pricing and defines basic terms and industry standards.

First and foremost, are the individual patients. The interests and power of the individual depend on whether she is insured and by whom. The primary concerns for individuals are quality care, choice in selecting their providers (in this case their pharmacy), and cost. Pharmacies want access to the patients and to be able to sustain a profitable business. Insurers are in the business of providing for the patients' needs, ideally in a sustainable manner.

"A prescription drug gets from the pharmaceutical manufacturer to the privately insured individual via a multifaceted distribution and pricing system and a range of stakeholders." Mercer Human Resource Consulting, *Navigating the Pharmacy Market Place*, at 17 (Jan.2003), *available at* http://www.phar macy.ca.gov/pub lications/pbm_ch cf_jan_03.pdf (prepared for California HealthCare Foundation). Though the path by which the actual product moves from the manufacturer to the consumer is fairly simple, the "flow of money involves a wider range of players and complex financial relationships." *Id.* at 18. How much a consumer pays for a given prescription will depend on who she is, whether she is insured and by whom, as well as a multitude of negotiations that may occur between the various actors.

The first level of pricing is set by the manufacturer of the drug, where the costs of research and development, marketing, and demand are taken into account. *See id.* at 21. The price reflects the manufacturer's "wholesale acquisition cost" ("WAC"). *Id.* In addition, the manufacturer establishes the "average wholesale price" ("AWP"). *Id.* The AWP is often described as a "suggested retail price" and is often above the price that large purchasers pay. *Id.* Typically, the next step in the pharmaceutical chain are the wholesalers, who buy pharmaceuticals in bulk at a discount to sell to pharmacies. *Id.* at 22.

Pharmacy Benefit Managers ("PBM") came into being in response to the rising costs of pharmaceutical products. *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 307 F.Supp.2d 164, 169 n. 1 (D.Me.2004). A PBM administers prescription drug programs for insurers, or sometimes for employers for their employees. *Id.* at 30. A PBM may perform several functions, including:

— Purchasing and dispensing medications through their own mail order pharmacies

— Paying claims

— Acting as an intermediary between pharmacies and the insurer

— Creating and maintaining pharmacy networks

*Id.* at 30–31. A PBM typically reimburses pharmacies under a formula based on the drug's AWP minus a percentage, plus a dispensing fee. *See* Pls.' Ex. 28 at 2. PBMs are often successful in lowering the costs of a prescription drug plan. Press Release, Pharmaceutical Care Management Assoc., New FTC–DoJ Find 'Competitive' PBM Marketplace Saving Consumers & Employers on Cost of Their Prescription Drugs (July 23, 2004) *available at* http:www.pcmane t.org/2004_addR eleases/press_84 .asp. By pooling claims, PBMs are able to negotiate for lower prices, and then ideally pass the savings along to the insurers or the insured, or both. *See id.* By consolidating record keeping, PBMs more efficiently process individual claims. *See Pharmaceutical Care Mgmt.*, 307 F.Supp.2d at 169 n. 1. Finally, drug manufacturers compete to have their products on a PBM's list of preferred drugs. *Navigating the Marketplace*, at 31.

PBMs are compensated through any combination of fee for service arrangements; earning the "spread" between the amount they pay the pharmacies, compared to the amount they receive from the insurer; rebates from drug manufacturers; revenue from mail order pharmacies; and other arrangements. *Id.*

With the rise of PBMs and pharmacy networks, pharmacies are often faced with a decision of whether to join a network. *See id.* at 32–33. A pharmacy may have to agree to a lower reimbursement rate by joining a network but that loss may be countered by an increase in market share. *See id.*

Health insurance plans play a role in the pharmaceutical market. In the past health insurance plans were focused on a fee for service arrangement, whereby an insured would go to the doctor of his or her choice, or fill a prescription at the local pharmacy. As health care costs sky-rocketed, however, health insurance plans began to limit where insureds could get services in order to negotiate lower costs.

In response to rising health care costs, the United States Congress adopted the Health Maintenance Organization Act of 1973. Pub.L. No. 93–222, 87 Stat. 914 (codified at 42 U.S.C. §§ 300e to 300e–17 (1988 & Supp. V 1994)). As health care costs continued their upward trend, insurance companies sought to transition from the traditional "fee for service" system of medical insurance, where medical providers had control over the amount and cost of medical care provided, to a health maintenance organization ("HMO") based system. Under the HMO model of medical insurance, the HMO was able to control costs by "lock[ing] out" other providers, thereby gaining bargaining power to lower the rates charged by the selected providers. William J. Bahr, *Although Offering More Freedom to Choose, "Any Willing Provider" Legislation is the Wrong Choice*, 45 U. Kan. L.Rev. 557, 557 (1997).

One criticism of the HMO model is that as greater focus is placed on the bottom line, the amount and quality of health care tends to suffer. An additional concern is that many solo practitioners and small offices or pharmacies are left out of HMO networks, affecting the providers individually, and affecting patients' access to their chosen medical care professionals.

Some groups fear this evolution within the health care system. They worry that managed care organizations will limit physician options and harm patients through systematic cost-cutting.

They foresee cookbook medicine through imposed practice guidelines; bureaucratic controls through utilization review; and dissipation of physician-patient trust as a result. They fear that profound inequality within our health care system will result from any "rush" toward efficiency-based medicine. Primarily, however, they fear a corporatization of health care.

Barry R. Furrow, *Incentivizing Medical Practice: What (If Anything) Happens to Professionalism?*, 1 Widener L. Symp. J. 1, 3–4 (1996) (footnotes omitted).

### B. The Parties

Harvard Pilgrim emerged in 1995 out of a merger of Harvard Community Health Plan and Pilgrim Health Care.[5] Defs.' Mem. at 2. Harvard Pilgrim is an HMO operating in Massachusetts under the provisions of Massachusetts General Laws chapter 176G. Harvard Pilgrim's Answer to Compl. ¶ 10 [Doc. No. 50]. At the time of the filing of this complaint, Harvard Pilgrim was the largest provider of managed health care in Massachusetts, with approximately one million members. Pls.' 56.1 Stmt. ¶ 2. Harvard Pilgrim provides prescription drug benefits to its members in Massachusetts. Defs.' Mem. at 2. A characteristic of HMO insurance is that its enrollees are limited to using designated service providers. Compl. ¶ 27. As part of the Harvard Pilgrim Plan, members could only be reimbursed for the cost of covered prescriptions if they were filled at a network pharmacy. Defs.' Mem. at 2–3.

CVS, formerly CVS Division of Melville Corporation, is a Delaware corporation that in 1998 operated 293 of the 1,272 licensed pharmacies in Massachusetts. Pls.' 56.1 Stmt. ¶¶ 3–4.

CVS created PharmaCare as its subsidiary in June 1994. Throughout the period of 1997 to 1999, CVS owned a 95.8% beneficial interest in PharmaCare. *Id.* ¶ 8. Currently, its website states that it is a fully owned subsidiary of CVS. Pharma-Care, *About Pharmacare*, available at http://www.phar macare.com/abou t/index.jsp. PharmaCare is a pharmacy benefit manager. Pls.' 56.1 Stmt. ¶ 6. As such, it manages and administers the provision of prescription benefits and pharmacy networks for various health insurers, including HMOs such as Harvard Pilgrim. *Id.*

During the period in question, Pharma-Care had four directors, three of whom were officers of CVS: Thomas M. Ryan was the President of CVS, Zenon P. Lankowsky was Vice–President and General Counsel of CVS, and Charles Conway was the Chief Financial Officer of CVS. Pls.' Ex. 1, (Weishar Dep. at 105–06); Pls.' Ex. 37, (List of PharmaCare Directors and Officers provided by PharmaCare); CVS Corp., *1998 Annual Report 40*, available at http://www.corp orate-ir.net/me dia_files/NYS/c vs/cvs_990401_2 00_120.-pdf. Ryan was simultaneously the Chairman of PharmaCare and Lankowsky was PharmaCare's Secretary. Pls.' Ex. 37.

### C. The 1990 Agreement

Harvard Pilgrim and CVS entered into a pharmacy network agreement effective August 6, 1990 ("1990 Agreement"). Pls.' 56.1 Stmt. ¶ 9; Pls.' Ex. 3 (Pharmacy Network Agreement August 6, 1990). Through this agreement, and later amendments, CVS became the exclusive provider of drug benefits to Harvard Pilgrim members. Pls.' 56.1 Stmt. ¶ 12. In order to ensure there was adequate coverage for all Harvard Pilgrim members, CVS was required to use its best efforts to subcontract

---

**5.** For the purposes of this case stated, the Court will refer to the pre–1995 parties, Harvard Community Health Plan and Pilgrim Health Care, as Harvard Pilgrim as well.

with non-CVS pharmacies where a CVS pharmacy was not geographically available. Pls.' Ex. 3; Defs.' 56.1 Resp. ¶ 12.

As a cost containment measure, in exchange for this near exclusive grant of its prescription drug business to CVS, Harvard Pilgrim negotiated a low CVS reimbursement rate for prescription drugs. Pls.' Ex. 1, (Birnier Dep. at 21–22). In the first year of the initial contract, CVS was to receive Base Line Price, (later termed Maximum Allowable Cost "MAC"), minus copayment for generics and Average Wholesale Price minus 2.5% for non-generics. Pls.' Ex. 3. In the second year non-generics were to be reimbursed at AWP minus 3.5%. *Id.* In addition, Harvard Pilgrim was to provide a monthly analysis of CVS's volume of authorized services. *Id.* If, during the first year CVS's volume of authorized services fell outside of a range of 67%—75%, the non-generic rates were to be adjusted. *Id.* Following the first year, if the subcontracting pharmacies delivered more than 25% of the average of the total authorized services over a six-month period, the parties agreed to re-negotiate. *Id.* The adjustment provisions were eliminated by the Second Amendment. Pls.' Ex. 4, (Second Amendment to Pharmacy Network Agreement). The subcontracting pharmacies were reimbursed at a rate of AWP minus 10% or the Base line price where applicable, plus a dispensing fee. Pls.' Ex. 6, (Pharmacy Network Agreement).

The Third Amendment to the agreement, effective as of December 30, 1993, stated that the duration of the contract was indefinite, but provided that either party could terminate the contract without cause so long as notice was provided. Pls.' 56.1 Stmt. ¶ 13. The Fourth Amendment, dated "as of" November 15, 1993, specified that Harvard Pilgrim would not "contract with any other pharmacy to provide drug benefits to Harvard Pilgrim Members during the term of the [1990 Agreement]." Pls.' 56.1 Stmt. ¶ 14. The Fifth Amendment, dated November 15, 1993 adjusted the rate of drugs without a MAC to AWP minus 6% minus co-pay. Pls.' Ex. 4. In addition to the rate adjustment, CVS agreed to provide Harvard Pilgrim with "documentation reasonably satisfactory to HCHP of CVS' efforts to assist HCHP in controlling its prescription drug costs." *Id.*

The 1990 Agreement remained in effect until June 1, 1998. Pls.' 56.1 Stmt. ¶ 11; Defs.' 56.1 Resp. ¶ 11; *see* Pls.' Ex. 5, (Letter dated April 28, 1998 from Pharma-Care to "Dear Provider"). During that entire time, Harvard Pilgrim paid CVS a percentage of the AWP for non-generics, a form of reimbursement that was typical of the industry. Pls.' Ex. 3; *Navigating the Pharmacy Market Place,* at 26.

### D. The Any Willing Provider Law and the Most Favored Nation Rule

The purpose of any willing provider laws is to counter a purely market-based determination of how and by whom medical care should be provided. These laws typically seek to protect providers, improve the quality of patient care, and increase patient freedom of choice. Michael Misocky, *The Patients' Bill of Rights: Managed Care Under Seige,* 15 J. Contemp. Health L. & Pol'y 57, 92 (1998).

In June 1994, the Massachusetts General Court enacted the Massachusetts Pharmacy Freedom of Choice—Any Willing Provider Law (sometimes referred to as "AWPL"), to be effective on January 1, 1995. Mass. Gen. Laws ch. 176D § 3B. The legislature enacted this law for the purpose of increasing "patient access to and choice of pharmacies, and protecting pharmacies which have been excluded

from carriers' networks." *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.,* 973 F.Supp. 60, 61–62 (D.Mass.1997) (Lasker, J.). *See* Mass. Gen. Laws ch. 176D § 3B. There are two main portions of this legislation. The first lays out requirements a carrier must follow in order to create a restricted pharmacy network. The statute requires that any "carrier that offers insureds a restricted pharmacy network" must follow certain requirements in "soliciting, arranging, competitively bidding and contracting for such a network . . . ." Mass. Gen. Laws ch. 176D, § 3B. Those requirements include in part: (1) notice to eligible bidders; (2) that all eligible bidders are provided information "on an identical, equal and uniform basis." *Id.* The statute also states that "[a] carrier shall neither exclude nor favor any individual pharmacy, or group or class of pharmacies, in the design of a competitive bid involving restricted or nonrestricted pharmacy networks in compliance with the requirements of this section." *Id.* In addition, an entity assisting the carrier "in the development or management of said design, network contracts, bid specifications or the bid process, or assist[ing] in the review or evaluation of said bids, shall be prohibited from bidding on such a contract." *Id.*

Second, the statute requires that, if a carrier establishes a restricted network, it must allow any willing pharmacy to provide its insureds with prescription medications so long as the pharmacy agrees to the same terms as the network pharmacies.

> A retail pharmacy registered pursuant to sections thirty-eight and thirty-nine of chapter one hundred twelve, or an association of such pharmacies whose purpose is to promote participation in restricted pharmacy networks, which are not offered or are not participating in a carrier's restricted pharmacy network contract shall nevertheless have the right to provide drug benefits to the carrier's insureds provided that such non-network pharmacies reach the following agreements with the carrier:
>
> (1) to accept as the carrier's payment in full the lowest price required of any pharmacy in the carrier's restricted pharmacy network;
>
> (2) to bill the insured up to and not in excess of any copayment, coinsurance, deductible or other amount required of an insured by the carrier;
>
> (3) to be reimbursed on the same methodological basis, including, but not limited to capitation or other risk-sharing methodology, as required of any pharmacy in the carrier's restricted pharmacy network;
>
> (4) to participate in the carrier's utilization review and quality assurance programs, including utilization and drug management reports as required of any pharmacy in the carrier's restricted pharmacy network;
>
> (5) to provide computerized on-line eligibility determinations and claims submissions as required of any pharmacy in the carrier's restricted pharmacy network;
>
> (6) to participate in the carrier's satisfaction surveys and complaint resolution programs for its insureds;
>
> (7) to protect the carrier's proprietary information and an insured's confidentiality and privacy;
>
> (8) to abide by the carrier's performance standards with respect to waiting times, fill rates and inventory management, including formulary restrictions;
>
> (9) to comply with the carrier's claims audit provisions; and
>
> (10) to certify, using audit results or accountant statements, the fiscal soundness of the non-network pharmacy.

*Id.* Basically, if a pharmacy is willing to accept the same terms as a network pharmacy, the carrier must allow the non-network pharmacy to provide services to its insureds. The statute does allow the carrier to "impose a cost-sharing charge for the use of a non-network pharmacy not to exceed five percent more than the charge for using any pharmacy in the carrier's restricted network." *Id.*

Though the Any Willing Provider Law does not prohibit restricted networks, it does preclude a carrier from "impos[ing] any agreements, terms or conditions on any non-network pharmacy . . . which are more restrictive than those required of any pharmacy in the carrier's restricted pharmacy network." *Id.* As noted by Judge Lasker "[t]he Act does not dictate the terms of the relationship between carrier and pharmacy, but instead uses the agreement a carrier reaches with its network pharmacies as a benchmark against which to measure its relationships with non-network pharmacies." *American Drug Stores, Inc.,* 973 F.Supp. at 61.

This law took effect on January 1, 1995, but it provided for a one-year grace period for health insurance plans with an existing agreement with particular pharmacies, i.e. if a carrier had a contract in effect as of December 31, 1994, it could renew or extend that agreement an additional year. Mass. Gen. Laws ch. 60 § 308.

The Commissioner of Insurance issued a bulletin on December 1, 1995, stating in part:

> It is the Division's determination that the [Any Willing Pharmacy Law] is intended to require a competitive bidding process be used in any instance in which a carrier provides (including where it continues to provide) pharmaceutical drug benefits to insureds, which under the terms of a carrier's policy, certificate, contract or agreement of insurance or coverage either requires an insured or creates a financial incentive for an insured to obtain prescription drug benefits from one or more participating pharmacies that have entered into a contractual relationship with the carrier.

Pls.' Ex. 12, (Bulletin 95–12 from the Division of Insurance).

Richard Mastrangelo ("Mastrangelo"), the First Deputy Commissioner and General Counsel of the Division of Insurance reiterated the position set forth in the bulletin on December 22, 1995 in a memorandum addressed to commercial health insurers, Blue Cross–Blue Shield of Massachusetts, and Health Maintenance Organizations. *Id.* In this memorandum, Mastrangelo stated that "I am writing to make its intent crystal clear: the statute is intended to require that all commercial health insurers, Blue Cross–Blue Shield of Massachusetts and all Health Maintenance Organizations *must* allow any pharmacy wishing to do so, to provide prescription drug [sic] to qualified insureds." *Id.*

In addition to the Any Willing Provider Law, Medicaid's Most Favored Nation Rule applied. *See* 42 U.S.C.A § 1396r–8; Mass. Regs.Code tit. 114.3 § 31.01 *et seq.* In 1990, Congress initiated a Medicaid rebate program as part of the Omnibus Budget Reconciliation Act of 1990. Pub.L. No. 101–508, 104 Stat. 1388 (1990). This program was designed to keep Medicaid prices low. Although the Government was the largest purchaser of prescription drugs, it was not able to translate that volume into bargaining power. Further state regulations provide the terms by which a pharmacy could charge for a prescriptions dispensed to Medicaid patients. *See* Mass. Regs.Code tit. 114.3 § 31.01. "The State required that pharmacies would provide similar rate structures under the same model relative to Medicaid. So, if you were under a similar model,

you'd have to pass along to the State a lower rate if it existed." Pls.' Ex. 1, (Morrison Dep. at 79).

### E. The Harvard Pilgrim/Pharma-Care Agreement

CVS created PharmaCare the same month the Massachusetts Legislature enacted the Any Willing Provider Law. PharmaCare in turn began negotiations with Harvard Pilgrim to preserve the Harvard Pilgrim–CVS relationship. Apparently in response to the recently enacted Any Willing Provider legislation, PharmaCare presented a proposal to Harvard Pilgrim regarding its pharmacy network. Pls.' 56.1 Stmt. ¶ 20; Pls.' Ex. 7 (Harvard Community Health Plan Capitation Proposal). Within this document, PharmaCare noted that its proposal offered a "Strategic solution to any-willing-provider." *Id.* A similar statement is found in a document entitled "PharmaCare: Background/Program Analysis/Discussion Issues/Recommendations," prepared by CVS and PharmaCare. Pls.' Ex. 13.[6]

The "PharmaCare Program Analysis," presented to Harvard Pilgrim in 1995, included the following statements under the heading "Background":

— CVS/PharmaCare and HPHC wish to negotiate a risk share agreement with PharmaCare under which HPHC would pay PharmaCare a Per Member Per Month (PMPM) rate

— Any Willing Provider and Most Favored Nations legislation requires a synergistic solution for HPHC, CVS and PharmaCare.

*Id.*

The page entitled "Harvard Pilgrim Health Care Proposal Guidelines" included:

— Protect all parties from Any Willing Provider and Most Favored Nations legislation through capitation based structure . . . .

— Restructure pricing to align incentives for HPHC and CVS/PharmaCare

— Restructure risk share to reflect CVS/PharmaCare's ability to manage price with true-ups for utilization and copay

*Id.*

On December 21, 1995, Harvard Pilgrim and PharmaCare entered into an agreement, with a retroactive effective date of January 1, 1995. Pls.' 56.1 Stmt. ¶ 22. This agreement provided that PharmaCare was to be the "Prescription Benefit Manager" for Harvard Pilgrim. *Id.* The agreement was amended in writing and verbally. *Id.* ¶¶ 23, 24. As part of the agreement, PharmaCare "was responsible for contracting directly with pharmacies that provided services to Harvard Pilgrim members and for reimbursing those pharmacies for the prescriptions filled by those insureds." Defs.' Mem. at 2. As a result, PharmaCare took over issuing payments to pharmacies. Pls.' Mem. in Supp. of Summ. J. at 4. [Doc. No. 167] ("Pls.' Mem."). Prior to March 16, 1998, PharmaCare was reimbursed by Harvard Pilgrim at different rates depending on whether a prescription was dispensed from a CVS or non-CVS pharmacy. *Id.* PharmaCare was reimbursed at a rate of AWP minus 6% for prescriptions dispensed at CVS stores and at the actual rate of reimbursement for prescriptions dispensed by other pharmacies. *Id.*

As part of the contract, Harvard Pilgrim provided PharmaCare with historical data

---

**6.** The Defendants dispute that the document was prepared by both PharmaCare and CVS as the Independent Pharmacies cited no extrinsic evidence to this effect. Defs.' 56.1 Resp. ¶ 26. Each page of the document has the logo of both PharmaCare and CVS, however, and the Court finds that both were involved in its creation. *See* Pls.' Ex. 13.

indicating the prescriptions dispensed to its members. Pls.' Ex. 9, (PharmaCare Management Services, Inc. Agreement). That information provided the basis for the rate PharmaCare was to be paid. *Id.* Through this contract, the parties were privy to certain confidential information, which the parties agreed not to disclose without prior written consent. *Id.*

In the Second Amendment of the Agreement, the parties agreed that:

> [T]he Capitation and risk sharing provisions ... shall apply only during any period of time in which CVS shall maintain market share, defined as total claim dollars based on pricing formulas established in this Agreement, equivalent to the following levels by HPHC product type:
>
> Pilgrim Legacy HMO, capitated plans: 90%
>
> Harvard Legacy HMO, capitated plans: 80%

For any period of time during which CVS's said market share shall fall the [sic] either of the percentages as defined above, PharmaCare reserves the right, at its sole discretion, to terminate this Agreement. In this case, PharmaCare and HPHC agree to renegotiate anew [sic] Agreement in good faith.

Pls.' Ex. 10, (Second Amendment to Agreement).

On September 20, 1999, in the Third Amendment, the parties extended the term of the contract by 90 days to March 31, 2000 and ratified all other terms, including the provision regarding CVS's market share. Pls.' Ex. 10, (Third Amendment to Agreement).

### F. Opening up the network

Harvard Pilgrim had been quite satisfied with CVS as its sole source for prescriptions to its members. CVS had willingly joined with Harvard Pilgrim in innovative risk sharing and cost containment efforts. Thus, Harvard Pilgrim grudgingly yielded ground to the Any Willing Provider Law.

Osco Drug Stores filed an action against Harvard Pilgrim alleging that it was excluding them from its network of pharmacies in violation of the Any Willing Provider Law. Pls.' 56.1 Stmt. ¶ 27; Complaint, *American Drug Stores Inc. d/b/a/ Osco Drug Stores v. Harvard Pilgrim Health Care, Inc. and Prudential Health Ins. Group*, F.Supp. 60 (D.Mass.)(Lasker, J.)(No. 96–10084–MEL). This litigation caused Harvard Pilgrim, CVS, and PharmaCare to step up negotiations with a view toward preserving their relationship while submitting to the Any Willing Provider Law. At the conclusion of these negotiations, PharmaCare purported to offer a new "Managed Care Pharmacy Agreement" to all pharmacies in Massachusetts. Pls.' Ex. 18, (PharmaCare letter dated Feb. 27, 1998 to "Dear Pharmacist"), Pls.' Ex. 19, (Managed Care Pharmacy Participation Agreement). Under the proposed Agreement, PharmaCare would pay a flat rate of $29.70 per brand or generic prescription sold by a participating pharmacy, regardless of the actual cost to the pharmacy. Pls.' Ex. 19. Harvard Pilgrim would in return, reimburse PharmaCare AWP minus 8.5% for each prescription whether it was dispensed by a CVS or non-CVS pharmacy. *Id.* Tellingly, in a March 12, 1998 PharmaCare document entitled "Managed Care Pharmacy Participation Agreement Summary" PharmaCare admitted:

> Percent reimbursement rate is 1/2 of CVS exclusive rate, this is not containing healthcare costs for Harvard as their PMB [prescription benefits manager], this is keeping CVS, Inc. whole in light

of losing the exclusive as pharmacy provider.

Pls.' Ex. 22.[7]

The Osco litigation settled in 1997, and shortly thereafter those pharmacies were allowed to participate in the Harvard Pilgrim network. Pls.' 56.1 Stmt. ¶ 28; Defs.' Ex. 21, (Settlement Agreement). According to Harvard Pilgrim, though they contested the claims raised by Osco, in 1998 they agreed to open their network to "all pharmacies on an equal basis." Defs.' Mem. at 3; Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. at 3 [Doc. No. 179] ("Defs.' Opp'n"). Stop and Shop pharmacies were allowed to join the network beginning on March 2, 1998. *Id.* at ¶ 29. In a letter dated February 27, 1998, PharmaCare invited all pharmacies to join a new Harvard Pilgrim pharmacy network as of March 16, 1998. *Id.* at ¶ 33; Pls.' Ex. 18. Prior to mailing this February 27th letter, PharmaCare had first determined that its proposed rates of reimbursement for prescriptions were acceptable to CVS. Pls.' Ex. 1, (Weishar Dep. at 58–59).

### G. The 1998 Managed Care Pharmacy Participation Agreement

In order to join the network, each participating pharmacy had to sign a "Managed Care Pharmacy Participation Agreement," which "contained identical service and reimbursement terms." Defs.' Opp'n at 3. Under the 1998 Participation agreement (effective March 16, 1998), each

pharmacy was paid the $29.70 flat rate per non-generic prescription dispensed, regardless of the actual cost of the prescription to the pharmacy, excepting a few specified drugs. Pls.' 56.1 Stmt. ¶ 43. This rate is referred to as a "capitated" reimbursement rate.[8] At various times after March 16, 1998, the rates of reimbursement were changed. Pls.' 56.1 Stmt. ¶ 44. Payments were made by PharmaCare directly to the pharmacies. Pls.' Ex. 19. PharmaCare was paid a per member per month rate, but ultimately was reimbursed by Harvard Pilgrim the Average Wholesale Price (as defined in the agreement) minus 8.5% for brand drugs through a "true-up" process. Pls.' 56.1 Stmt. ¶ 42; Pls.' Ex. 11 (Response to Interrog. 14). The "true-up" process would reconcile the differences between the per member per month rate and the AWP minus 8.5% rate. Defs.' 56.1 Resp ¶ 42.

In addition to the terms provided for in the 1998 Participation Agreement, every pharmacy had to agree not to sue Harvard Pilgrim and PharmaCare for any claims related to its network operation "including but not limited to claims brought under AWP." Defs.' Mem. at 4. That is, the very agreement upon which the Defendants' rely to demonstrate compliance with the Any Willing Provider Law contains express language requiring the weaker party to the agreement (the independent pharmacy) to give up its rights under the law

---

7. During this same period, Greg Weishar, the President of PharmaCare, in an October 2, 1997 memorandum to Health New England, recommended that Health New England "open the network, under a new contracting process wherein PharmaCare will permit participation to any willing pharmacy based on a[sic] a flat fee per RX; The current contract with CVS will require cancellation... The current financial arrangement between HNE and PharmaCare will remain intact." Pls.'

Ex. 16, (Memorandum to Health New England).

8. Defendants contend that the rates are not actually "capitated," which, by their definition involve "fixed fees per patient" whereas the rates at issue are "fixed fees per prescription." Nevertheless, the Defendants chose to use the "capitated" term for ease of reference, and this Court does so as well. Defs.' Mem. at 3, n. 2.

passed, in part, for its express benefit. *See* Pls.' Ex. 19. At oral argument, in response to this Court's concern that this provision would violate the Any Willing Provider Law in and of itself, the Defendants contended that they had not sought to enforce this release provision. Tr. of Hr'g of Oct. 20, 2004, at 25. This is simply untrue.[9] The Eighteenth Affirmative Defense raised by CVS and PharmaCare in their answer states that "[s]ome or all of the putative members of the alleged plaintiff class have released the claims asserted in the Complaint." Answer of Defs.' CVS and PharmaCare [Doc. No. 52].

Throughout the class period, Harvard Pilgrim continued to evaluate PharmaCare's management of its prescription benefit program. In a report prepared for Harvard Pilgrim dated October 18, 1999, William M. Mercer Incorporated compared various PBMs, including PharmaCare. Pls.' Ex. 28, (Mercer Report). PharmaCare was by far the most expensive of the PBMs evaluated. *See id.* This report ultimately led to Harvard Pilgrim concluding that the arrangement with PharmaCare was not containing costs. *See* Pls.' Ex. 29, (Burton Orland email regarding PBM Updates). Soon thereafter, Harvard Pilgrim replaced PharmaCare with MedImpact Healthcare Systems, Inc. ("MedImpact"). Pls.' Ex. 30, (Service Agreement with Harvard Pilgrim Healthcare).

## III. APPLYING THE LAW TO THE FACTS (MIXED QUESTIONS OF FACT AND LAW)

"Ultimately, it was Enron's tragedy to be filled with people smart enough to know how to maneuver around the rules, but not wise enough to understand why those rules had been written in the first place."

> Kurt Eichenwald, *Conspiracy of Fools: A True Story,* 11 (Stacy Creamer, ed., 2005).

The Independent Pharmacies argue that the agreement between PharmaCare and Harvard Pilgrim violated the Any Willing Provider Law by illegally, unfairly, and deceptively favoring CVS and PharmaCare. Pls.' Mem. at 9. Although non-CVS pharmacies were reimbursed at the same rate as CVS pharmacies for individual prescriptions, the Independent Pharmacies argue that Harvard Pilgrim's use of PharmaCare, a subsidiary of CVS, for prescription benefit management services was an attempt to circumvent the requirements of the Any Willing Provider Law. *Id.* at 14–15. They argue that by funneling money to PharmaCare and changing the methodology of reimbursement, Harvard Pilgrim was able to continue to favor CVS above the other pharmacies. *Id.*

The Defendants argue that (1) it did not violate the Any Willing Provider Law, Defs.' Opp'n at 7–14; (2) even if it did violate that law, that violation alone is

---

9. The Defendants sought to respond to the Court's concerns by submitting a letter explaining the history of the release and covenant not to sue. Nov. 11, 2004 Letter from Thane Scott, Esq. to The Honorable William G. Young [Doc. No. 199]("Letter from Scott"). The Defendants contend that the covenant not to sue was required from all pharmacies (including CVS pharmacies), in order to ensure equal treatment of all pharmacies. *Id.* The letter also noted that MedImpact continued the practice of requiring the release.

*Id.;* Defs.' Ex. 7. "Thus, from the time the network was first opened until the present, the release and covenant not to sue have been utilized evenhandedly and without material change by both [PharmaCare and MedImpact] ...." Letter from Scott.

The letter, however, neither corrected counsel's assertion at oral argument that the covenant not to sue was never invoked, nor addressed the Court's concern that such a covenant may in itself be violative of the Any Willing Provider Law. *See id.*

insufficient to establish liability under Chapter 93A, § 11, *Id.* at 5–7; and finally, (3) that the Independent Pharmacies have not established a loss of "money or property" as required under Chapter 93A. *Id.* at 4–5.

Neither CVS nor PharmaCare is directly liable to the Independent Pharmacies under the claim they presently pursue. *See* Mass. Gen. Laws. ch. 176D § 3B; Mass. Regs.Code tit. 211 § 44:03. Their liability, if any, stems from their concerted action with Harvard Pilgrim, i.e. from a claim that they were civil conspirators with Harvard Pilgrim.

## A. Violations of the Any Willing Provider Law

The allegation that the Defendants violated the Any Willing Provider Law has several facets to it, each requiring individual analysis.

### 1. Competitive Bidding Violation

First, the Independent Pharmacies contend that Harvard Pilgrim violated the statute by continuing its exclusivity agreement with CVS beyond the one-year grace period provided by the statute without competitive bidding. Compl. ¶¶ 76, 78. Though the motion for class certification on this claim was denied, *See* Order on Class Certification, the individual plaintiffs (J.E. Pierce, Sutherland Pharmacy, Meetinghouse Pharmacy, and Medfield Pharmacy), Compl. ¶¶ 5–8, claim that Harvard Pilgrim violated the Any Willing Provider Law in failing to solicit competitive bids as mandated by that statute. *See* Compl. ¶ 78. The class plaintiffs, (Meetinghouse Pharmacy, on behalf of itself and the class), allege that Harvard Pilgrim continued to violate the Any Willing Provider Law even after the "opening" of the network. *Id.* ¶¶ 7, 82–88; *See id.* ¶¶ 5, 6, 8.

■ The Defendants contend that the statute does not apply to Harvard Pilgrim's agreement with CVS by arguing that the exclusivity agreement is not a "restricted pharmacy network" as defined by the Any Willing Provider Law. Defs.' Opp'n at 8.

The statute and related regulations define a "restricted pharmacy network" as:

an arrangement for the provision of pharmaceutical drug benefits to insureds which under the terms of a carrier's policy, certificate, contract or agreement of insurance or coverage requires an insured or creates a financial incentive for an insured to obtain prescription drug benefits from one or more participating pharmacies that have entered into a specific contractual relationship with the carrier pursuant to a competitive bidding process.

Mass. Gen. L. ch. 176D § 3B.

Although Harvard Pilgrim concedes that its insureds were required to fill their prescriptions at network pharmacies, it argues that the statute only applies to pharmacy networks that were created "pursuant to a competitive bidding process." Defs.' Opp'n at 8. "It is undisputed that Harvard Pilgrim did not undertake a competitive bidding process to establish a restricted pharmacy network. Rather, from 1996 to 1998, it continued to abide by its contractual relationships with its pharmacies that provided services to its insureds.... [T]he AWP was drafted to specify what must occur when a network is competitively bid." *Id.*

■ Harvard Pilgrim's argument that the last six words of the definition of the term "restricted pharmacy network" limit applicability of the statute only to those insurers who follow the statute's requirements for fair and competitive bidding, if accepted by this Court, would render that portion of the statute a purely voluntary

and essentially nugatory act. Under standard statutory rules of construction, legislation is presumed to have been enacted in order to "remedy the evil at which the it appears to be aimed." *White Construction Co., Inc. v. Commonwealth*, 11 Mass. App.Ct. 640, 648, 418 N.E.2d 357 (1981) (quoting *Morse v. Boston*, 253 Mass. 247, 252, 148 N.E. 813 (1925)). "An intention to enact a barren and ineffective provision is not lightly to be imputed to the Legislature." *Insurance Rating Bd. v. Commissioner of Ins.*, 356 Mass. 184, 189, 248 N.E.2d 500 (1969). The interpretation urged by Harvard Pilgrim would render the provisions concerning the competitive bidding requirements completely ineffectual and in direct contrast to the language and general purpose of the Any Willing Provider Law. Moreover, the applicability of the law was further clarified by the Bulletin and Memorandum issued by the Commissioner of Insurance and First Deputy Commissioner of the Division of Insurance in December 1995. Pls.' Ex. 12.

The Defendants fail to address adequately why they continued to interpret the Any Willing Provider Law contrary to the interpretation adopted by the Massachusetts Division of Insurance. These letters not only pre-dated the "opening" of the network to other pharmacies, but the bulletin pre-dated the execution of the PharmaCare/Harvard Pilgrim Agreement, which was executed on December 21, 1995. *See id.;* Pls.' Exs. 9, 19.

The Defendants did mention the December 1, 1995 bulletin in both of its memoranda currently before this Court. Defs.' Mem. at 27; Defs.' Opp'n at 11. In its memorandum in support of summary judgment the Defendants contend that "[t]he Commissioner of Insurance specifically has stated that the competitive bidding process does not apply 'in a situation where a carrier has an 'open' network in which any

pharmacy that wishes to contract with the carrier to provide prescription drug benefits may do so.' " Defs.' Mem. at 27. This utterly mis-characterizes the letter, which actually states that:

> It is the Divisions's determination that the [Any Willing Pharmacy Law] is intended to require a competitive bidding process be used in any instance in which a carrier provides (*including where it continues to provide*) pharmaceutical drug benefits to insureds, which under the terms of a carrier's policy, certificate, contract or agreement of insurance or coverage *either requires an insured or creates a financial incentive for an insured to obtain prescription drug benefits from one or more participating pharmacies that have entered into a contractual relationship with the carrier.*

Pls.' Ex. 12 (emphasis added).

The Defendants continue this mis-characterization in their Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment where they state:

> The Division of Insurance Bulletin repeatedly relied on by plaintiffs confirms that competitive bidding was not required for the post March 16, 1998 network because it was "open" to "any pharmacy that wished[d] to contract with the carrier to provide prescription drug benefits."

Defs.' Opp'n at 11.

Simply put, Harvard Pilgrim and its pharmacy network was subject to the bidding requirement of the Any Willing Provider Law.

■ This Court also finds unconvincing the Defendants' argument that they are relieved from their involvement in this case because the pharmacies entered into a network with PharmaCare, which is not a "carrier" as defined by the Act. Defs.'

138

Opp'n at 10–11. Though PharmaCare is not a "carrier,"[10] Harvard Pilgrim most certainly is, and the three defendants here conspired together to circumvent the law through development of the restricted network.

■ The claim that CVS should have been prohibited from bidding on the restricted network because it was involved "in the development or management of [the network], network contracts, bid specifications or the bid process, or assists in the review or evaluation of said bids . . . ." Mass. Gen. L. ch. 176D § 3 B, is beside the point. There was no bidding process. There should have been. The Defendants violated the Any Willing Provider Law by acting in concert to create a restricted network without competitive bidding. As noted above, however, there is no private cause of action to enforce the provisions of the Any Willing Provider Law. *Id.* The Court considers below whether this violation constitutes a violation of Mass. Gen. Laws ch. 93A, § 11.

## 2. The Overpayment of PharmaCare

■ As a result of the Osco litigation, Harvard Pilgrim chose to "open[ ] the Harvard Pilgrim pharmacy network to all interested parties" rather than litigating whether Harvard Pilgrim was required to comply with the competitive bidding requirements of Any Willing Provider. Defs.' Opp'n at 3. The Independent Pharmacies allege that Harvard Pilgrim continued a restricted network that, on its face, appeared to comply with the Any Willing Provider Law, but in actuality used the services of PharmaCare, the wholly-owned

subsidiary of CVS, in order to continue a nearly exclusive relationship with CVS. Pls.' Opp'n at 10. The Independent Pharmacies further contend that "the defendants wanted to reimburse pharmacies at a low rate for prescriptions, thereby diminishing participation from competing pharmacies and simultaneously funneling additional amounts to CVS through its wholly-owned subsidiary, PharmaCare." Pls.' Mem. at 5. Thus the claim has two aspects constituting the conduct that allegedly violated the Any Willing Provider Law and, potentially, Mass. Gen. Laws chapter 93A, § 11; i.e. (1) Harvard Pilgrim's alleged attempt to squeeze out competition by favoring CVS by creating the contract with PharmaCare, and (2) the overcompensation of CVS through its subsidiary PharmaCare.

Without PharmaCare in the picture, a contract with a pharmacy benefits manager negotiated at arms length might well not, in itself, have violated the statute. Though the intent of the legislature was to allow any pharmacy wishing to provide services within a network to be able to do so, it was clear that those pharmacies would have to agree to the same terms as a network pharmacy. *See* Mass. Gen. Laws ch. 176D § 3B. Had CVS been able to maintain its relationship with Harvard Pilgrim by ensuring that reimbursement rates were low enough to discourage other pharmacies from participating, yet high enough that CVS could sustain itself, without any involvement by or through PharmaCare, it might have been able legally to circumvent the effects of the Any Willing

10. A "carrier" is defined "as an insurer operating pursuant to the provisions of M.G.L. c. 175, a hospital service corporation operating pursuant to the provisions of M.G.L. c. 176A, a medical service corporation operating pursuant to the provisions of M.G.L. c. 176B, a health maintenance organization operating pursuant to the provisions of M.G.L. c. 176G, and a preferred provider arrangement operating pursuant to the provisions of M.G.L. c. 176I, or a wholly-owned subsidiary or affiliate under common ownership thereof." Mass. Regs.Code tit. 211 § 44:03.

Provider law. Here, however, Pharma-Care could reimburse pharmacies at a very low rate, without jeopardizing CVS's financial health because PharmaCare was guaranteed a much higher reimbursement from Harvard Pilgrim. Moreover, PharmaCare could re-negotiate if CVS was not maintaining its share of the market. Pls.' Ex. 4.

Harvard Pilgrim rejects this characterization of the arrangement, noting that the contracts with CVS and PharmaCare are two different arrangements that should not be construed in conjunction with one another. Defs.' Mem. at 8–9. "CVS retail pharmacies signed the same contract and received the same reimbursement as all of the pharmacies in the plaintiff class." Defs.' Opp'n at 12. PharmaCare's reimbursement was for a different contract entailing different services. *Id.*; Defs.' Mem. at 9–10. PharmaCare provided Harvard Pilgrim with various other services not provided by any other pharmacy, including "claims processing, clinical information management and formulary management, and also included a risk-sharing component that reflected market events." Defs.' Mem. at 9.

On its face, there would appear to be no violation. It is true that all pharmacies receive the same amount per prescription from PharmaCare. Defs.' 56.1 Stmt. ¶ 22. Even if the payments to PharmaCare are attributed to CVS, the Defendants contend that these additional payments are for the additional services provided by Pharma-Care to Harvard Pilgrim. Defs.' Mem. at 9. Nevertheless, after a careful review of the entire record, it is apparent that this arrangement is a concerted effort to circumvent the Any Willing Provider Law, and the Court so finds. Though Pharma-Care was entitled to compensation for its services, it is not entitled to be overcompensated beyond the value it added in

order to line the pockets of CVS. Pharma-Care was acting not only on its behalf, but on the behalf of its parent CVS.

For example, in its agreement with Harvard Pilgrim, PharmaCare retained the right to cancel the agreement if CVS' market share of Harvard Pilgrim prescriptions fell below 80%. Pls.' Ex. 10. Though the Defendants contend that all pharmacies were treated equally, the fact that the 1998 Agreement would remain intact only so long as CVS maintained the lion's share of the market evidences the advantages CVS enjoyed in the "open" network. *See id.*

Other evidence pointing to a "sweetheart deal" are found in documents prepared by the Defendants. One CVS document states "we need to consider what lower rate of reimbursement to the pharmacy would be considered reasonable in that it exists elsewhere and yet would diminish the desire for participation." Pls.' Ex. 20.

Finally, as to the value added, a review of the Mercer Report strongly suggests that PharmaCare was compensated at a far higher level than other PBMs offering similar services. Pls.' Ex. 28. Pharma-Care argues that it added additional value by using a per member per month arrangement which allowed it to share risk with Harvard Pilgrim. Defs.' 56.1 Stmt. ¶ 10. Though PharmaCare did share some risk, this argument is less than persuasive in light of the "true-up" process that ensured additional payments to PharmaCare should the program costs go beyond the capitated rate. *See* Pls.' Ex. 1, (Birnier Dep. at 140–41).

The Defendants have consistently argued that Harvard Pilgrim would never have agreed to an arrangement that would be against its own economic interest. Defs.' Mem at 8–9, 17. This assertion is contradicted by the record. Gerald Plotkin, M.D., the Medical Director of the

Medical Groups Division of Harvard Pilgrim, submitted an affidavit as part of the Osco litigation. Pls.' Ex. 45 (Plotkin affidavit). In it, he states that exclusive pharmacy networks allow HMOs to "provide predictable, consistent levels of volume to providers in return for price concession...." *Id.* ¶ 3. He also noted that Harvard Pilgrim was able to realize savings of 5% to 10% in one of its prescription programs by directing volume to CVS. *Id.* ¶ 8. Moreover, HMO advocates in opposition to any willing provider laws throughout the nation often base their arguments on the benefits HMOs enjoy by exclusive arrangements with providers. Pls.' Ex. 8, (Letter from Michele Garvin and John C. Kane, Jr., Ropes and Gray, on behalf of Massachusetts Association of Health Maintenance Organizations, to Kevin Beagan, Director of Health Policy (Dec. 23, 1994)) (quoting former Commissioner of Insurance Roger Singer "[if] an HMO were required to contract with any willing pharmacy ... its ability to negotiate lower cost contracts for pharmacy services would also be destroyed because the HMO then would be unable to guarantee volume to any group of selected pharmacies."); *see* Matthew G. Vansuch, *Not Just Old Wine In New Bottles:* Kentucky Association of Health Plans, Inc. v. Miller *Bottles a New Test for State Regulation of Insurance,* 38 Akron L.Rev. 253, 270 (2005) (stating "[o]ne way [HMOs] have devised to control health care costs is 'selectively contracting,' where the [HMO] selects a limited number of [ ] health care providers to provide services to the [HMO's] membership in return for a reduced cost to the HMO."); James W, Childs, Jr., Comment, *You May be Willing, But are you Able?: A Critical Analysis of 'Any Willing Provider' Legislation,* 27 Cumb. L.Rev. 199, 207 (1997). (noting that "[p]roviders are

essentially guaranteed a steady volume of patients because the [HMO] will contract with only a select few providers."). The main cost benefit of HMOs lies in their ability to restrict providers and guarantee those selected providers higher volume in return for lower prices. Bahr, *supra* at 557. By guaranteeing CVS exclusivity, Harvard Pilgrim was in a stronger bargaining position because it could negotiate lower rates for its prescription plan in return for CVS's reliance on high volume for profit. Without this guarantee of volume, CVS likely would not have agreed to the low reimbursement rate.

One impediment to an agreement where CVS and Harvard Pilgrim contracted excessively low reimbursement rates is the Most Favored Nations rule. *See* Pls.' Ex. 1, (Morrison Dep. at 79). Though not directly at issue in this case, the Most Favored Nations Rule requires that a pharmacy not charge a higher rate for a prescription dispensed to a Medicaid recipient than the lowest reimbursement rate received for that prescription by the pharmacy from any other insurer. *Id.* By using a capitated rate rather than the typical AWP minus a negotiated percentage, CVS and Harvard Pilgrim were able to negotiate the lower rate, while CVS could continue to be reimbursed for Medicaid prescriptions at a higher rate.

It is hardly the desire of this Court to discourage innovative ways to reduce expenses in a time of rising health care costs. Nevertheless, cost is merely one of the competing interests that must be considered when addressing consumer health care needs. Here in Massachusetts, the General Court made clear in the Any Willing Provider Law, its policy of support for freedom of consumer choice, and concern for independent and small chain pharma-

cies. *See* Mass. Gen. L. ch. 176D § 3B.[11]

Harvard Pilgrim, PharmaCare, and CVS chose to ignore the mandate issued by the Massachusetts legislature. They came up with a creative way to circumvent the law and thus continued (in a modified form) a precise course of conduct that the Massachusetts legislature wished to prohibit. CVS was able to maintain its nearly exclusive arrangement with Harvard Pilgrim at the expense of consumers' choice and other non-CVS pharmacies. Meanwhile, PharmaCare was able to insure that CVS's profits were not at risk due to the low reimbursement rate.

### 3. Covenant not to Sue

■ CVS and PharmaCare allege that the members of the certified class released any claim under the Any Willing Provider Law when they joined the network by signing a release and covenant not to sue. **Answer of CVS and PharmaCare, Eighteenth Affirmative Defense [Doc. No. 52].** The Release stated:

Pharmacy acknowledges that this Agreement is entered into as part of a process through which PharmaCare, under contract with and on behalf of HPHC, is expanding the number of pharmacies through which HPHC eligible members may receive covered drugs, and that PharmaCare has agreed with HPHC to permit said expansion. Pharmacy agrees and acknowledges that that process, and this Agreement, do not involve the establishment of a restricted pharmacy network within the meaning of Mass G.L. c. 176D, 3B, and are not governed by that statute. Pharmacy further acknowledges HPHC's under-

standing that Mass.G.L. c. 176D, 3B has not applied to the arrangements through which HPHC's eligible Members have received Covered Drugs between July 1, 1994, and the date of this Agreement.... In consideration of this Agreement and of the actions of HPHC and PharmaCare .... Pharmacy .... hereby remise, release, absolve, acquit and forever discharge [the Defendants] from any and all actions ... which Releasors ... now have, have had or could have had against Releasees ... at anytime prior to or as of the date of the execution of this Agreement.... Pharmacy further covenants not to sue HPHC or PharmaCare ... for any claim based upon Mass.G.L.c. 176D, 3B, arising at any time prior to the date of, or during the term of, this agreement.

Defs.' Ex. 20, (Managed Care Pharmacy Participation Agreement); Pls.' Ex. 19, (Managed Care Pharmacy Participation Agreement).

When pressed about the propriety of such an agreement at oral argument, defense counsel suggested that the release was never enforced. This argument ignores the assertion of the release as an affirmative defense by PharmaCare and CVS and the argument in the Defendants' motion for summary judgment that the Independent Pharmacies have "the burden of proving facts showing a right to rescind the release." Defs.' Mem. at 20.

The Independent Pharmacies argue that the release and covenant not to sue is void as a "contract of adhesion." Pls.' Opp'n at 27. Rhode Island case law [12] has defined a "contract of adhesion" as "a phrase de-

---

11. The states' any willing provider statutes are often criticized for raising healthcare costs and it appears that the agreement under fire here was hardly a panacea for controlling costs. From the beginning of its "open network" arrangement with Pharmacare, Har-

vard Pilgrim continually analyzed its need to control costs. *See* Pls.' Ex. 28,

12. Pursuant to paragraph 16 of the 1998 Agreement, the law of Rhode Island is to control its interpretation.

scriptive of a standard form printed contract prepared by one party and submitted to another on a take-it-or-leave it basis. Usually there is no true equality of bargaining power between parties." *Id.* (quoting *Pickering v. American Employers Ins., Co.,* 109 R.I. 143, 282 A.2d 584, 593 n. 8 (1971)). Here, the determination as to whether the release is a contract of adhesion may require individualized investigation, which is difficult in the context of a class action. Such investigation is unnecessary, however, as the release is void on public policy grounds.

■ In Rhode Island, "[i]t is a general rule that contract or agreement against public policy is illegal and void." *City of Warwick v. Boeng Corp.,* 472 A.2d 1214, 1218 (R.I.1984); *Accord Spence v. Reeder,* 382 Mass. 398, 413, 416 N.E.2d 914 (1981) ("[i]n various circumstances, courts have long refused to give effect to purported waivers of statutory rights where enforcement of the particular waiver would do violence to the public policy underlying the legislative enactment.").

Although the non-CVS pharmacies could waive rights provided to them by statute for their own benefit, they could not waive the applicability of a statute that was designed to protect the general public as well as themselves. *Continental Corp. v. Gowdy,* 283 Mass. 204, 217, 186 N.E. 244(1933) ("Where laws are enacted on grounds of general policy their uniform application for the protection of all citizens alike is desirable, and an agreement to waive their provisions is generally declared invalid, but, where they are designed solely for the protection of rights of private property, a party who may be affected can consent to a course of action which if taken against his will would not be valid . . . .") (quoting *Washington Nat. Bank v. Williams,* 188 Mass. 103, 107, 74 N.E. 470 (1905)). *Accord Canal Electric Co. v. Westinghouse*

*Electric Corp.,* 406 Mass. 369, 378, 548 N.E.2d 182 (1990) ("A statutory right or remedy may be waived when the waiver would not frustrate the public policies of the statute.").

The policies that motivated the legislature to enact the Any Willing Provider Law did not focus solely on the protection of pharmacies left out of a network. The Act was also passed in order to ensure that consumers would have greater freedom of choice when choosing a pharmacy. Thus, the Court holds that the covenant not to sue is void as contrary to Massachusetts public policy. As will be seen, the Court need not determine if the requirement of such a waiver in and of itself violates the Any Willing Provider Law.

## B. Violation of Chapter 93A

■ Though the Court concludes that the Defendants, through their concerted actions, have violated the Any Willing Provider Law, inquiry does not end here. As noted above, the Any Willing Provider Law does not provide a private cause of action. Chapter 93A, however, is the appropriate avenue through which the Independent Pharmacies may seek a remedy for the violation. *Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co.,* 56 Mass. App.Ct. 853, 858, 780 N.E.2d 479 (2002) ("violation of a specific statute that does not itself permit private recovery may give rise to a private claim under c. 93A if the violation amounts to an unfair method of competition or an unfair or deceptive practice independently prohibited by G.L. c. 93A, § 2, and if recovery under c. 93A is compatible with the objectives and enforcement mechanisms the underlying statute contains."). This is not a simple mechanical inquiry. Not every unlawful act is a violation of Chapter 93A. *See Flood v. Midland Nat'l Life Ins. Co.,* 419 Mass. 176, 183–84, 643 N.E.2d 439 (1994); *Me-*

*chanics National Bank of Worcester v. Killeen,* 377 Mass. 100, 109, 384 N.E.2d 1231 (1979). To succeed on its Chapter 93A, § 11 claim, the Independent Pharmacies must show that the statutory violation also violates Chapter 93A § 2, or that the Defendants' behavior was in itself an unfair method of competition. Mass. Gen. Laws. ch. 93A, § 11.

A business may bring an action under section 11 of Chapter 93A against another person who engages "in an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two ...." *Id.* Important as Chapter 93A has become to consumer protection and fair business practices in the Commonwealth of Massachusetts, the legislation still does not define what constitutes unfair or deceptive practices. Section 2 paragraph (c) grants the Attorney General the authority to establish rules and regulations interpreting section 2(a), which declares unfair competition and unfair or deceptive acts unlawful. *Id.* at § 2(c). Pursuant to paragraph (c), the Massachusetts Attorney General promulgated Code of Massachusetts Regulations, title 940 section 3.16, which states that an act or practice violates Chapter 93A, section 2 if:

> 3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection ...;

Mass. Regs.Code · tit. 940, § 3.16(3); *see Action Ambulance Serv. Inc., v. Atlanticare Health Servs., Inc.,* 815 F.Supp. 33, 39 (D.Mass.1993)(Mazzone, J.).

■■■ Guided by the Federal Trade Commission definition of unfair trade practices, the Massachusetts Supreme Judicial Court adopted this definition of unfair practices:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen);

*Purity Supreme, Inc. v. Attorney · Gen.,* 380 Mass. 762, 777, 407 N.E.2d 297 (1980); *see American Tel. & Tel. Co. v. IMR Capital Corp.,* · 888 F.Supp. 221, 256 (D.Mass.1995)(Gertner, J.). In addition, the Supreme Judicial Court stated that "[a] practice may be 'deceptive' if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted.'" *Purity Supreme,* 380 Mass. at 777, 407 N.E.2d 297 (quoting *Lowell Gas Co. v. Attorney Gen.,* 377 Mass. 37, 51, 385 N.E.2d · 240 (1979)). Such "unfair practices" "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Quaker State Oil Ref. Corp. v. Garrity · Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989).[13]

---

**13.** This formulation is the classic description of "unfair practices" coined by Justice Kass in *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App.Ct. 498, 504, 396 N.E.2d 149 (1979). Sadly, it has since been criticized by the Supreme Judicial Court in *Massachusetts Employers Ins. Exchange v. Propac–Mass, Inc.,* 420 Mass. 39, 42, 648 N.E.2d 435 (1995). Nevertheless, the First Circuit has subsequently applied Massachusetts Chapter 93A law. *See, e.g., Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1483 n. 8 (1st Cir.1996). Perhaps

### 1. Statutory violation constituting a violation of Chapter 93A

The Independent Pharmacies argue that "a direct violation of a statute designed to regulate an aspect of trade or commerce ordinarily constitutes an unfair and deceptive practice in violation of Chapter 93A." Pls.' Mem. at 8. They argue that the Any Willing Provider Law was passed in order to protect consumers and thus, pursuant to the Code of Massachusetts Regulations, title 940, section 3.16, Harvard Pilgrim's conduct falls within the purview of Mass. Gen. Laws. chapter 93A, § 11. *Id.* at 7–8. The Defendants counter that the Independent Pharmacies have not shown that "Harvard Pilgrim acted immorally, unethically or unscrupulously in structuring its pharmacy network." Defs.' Opp'n at 7.

■■■■ "[O]ne can commit a chapter 93A violation without behaving like a 'rascal,' if one violates consumer protection or public safety laws." *Cablevision of Boston, Inc., v. Public Improvement Comm'n of the City of Boston,* 184 F.3d 88, 106 (1st Cir.1999). Nevertheless, the Independent Pharmacies overstate the case in contending that a violation of a statute ipso facto violates Chapter 93A, § 11. Just as an act that is not otherwise unlawful may violate Chapter 93A, not every statutory violation constitutes a violation of Chapter 93A. "The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful (or unlawful, we now add) apart from G.L. c. 93A but also by analyzing the effect of the conduct on the public (or the consumer)." *Mechanics Nat'l Bank of Worcester v. Killeen,* 377 Mass. 100, 109, 384 N.E.2d 1231 (1979) (quoting *Schubach v. Household Fin. Corp.,* 375 Mass. 133, 137, 376 N.E.2d 140 (1978)).

Harvard Pilgrim, citing *Knapp v. Sylvania Shoe Mfg. Corp.,* 418 Mass. 737, 743–44, 640 N.E.2d 1101 (1994) and *In re First New England Dental Centers, Inc. v. Aquino,* 291 B.R. 229 (D.Mass.2003), argues that Regulation 3.16 does not apply to business disputes. Defs.' Opp'n at 5. In *Knapp,* a federal district judge certified a question to the Massachusetts Supreme Judicial Court concerning whether "the provisions of 940 CMR § 3.08(2) apply to a simple breach of warranty" under the particular circumstances of that case. 418 Mass. at 737–38, 640 N.E.2d 1101. The Supreme Judicial Court noted that the regulation in question was promulgated prior to the enactment of Chapter 93A, § 11, and therefore did not contemplate the applicability of Section 11 to parties both of whom engage in trade or commerce. *Id.* at 744, 640 N.E.2d 1101. The Court stated that:

> [i]t is reasonably clear that, in drafting the regulation, the Attorney General had in mind protection for consumers against unfair or deceptive acts or practices .... The regulation, read as a whole, is rooted in § 9 of G.L. c. 93A. Where the bulk of the regulation applies only to consumers and their interests, and subsection (2) contains no language suggesting that it was meant to apply to a broader class of persons or interest, we conclude that the portion of subsection (2) at issue was not intended to encompass a contract dispute between businessmen based on a breach of merchantability.

*Id.* at 745, 640 N.E.2d 1101.

In *In re First New England Dental Centers, Inc. v. Aquino,* this Court was presented with the theory that the Code of Massachusetts Regulations, title 940, sec-

---

"rascality" lives on as an appropriate touchstone in the First Circuit. The matter is of no direct moment here, however, since, whatever the definition, the Defendants have violated it.

tion 3.16(2) could not be used to require heightened disclosure requirements when two business entities were negotiating. 291 B.R. at 240–241. Subsection (2) states that "[a]ny person or other legal entity subject to this act [who] fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction..." has violated chapter 93A. Mass. Regs.Code tit. 940, § 3.16(2). Here this Court held that the regulation should not apply, with language that suggests that the regulations promulgated by the Attorney General never apply to section 11 claims. 291 B.R. at 241. ("As the Court in *Knapp* suggested, the regulations were not meant to apply to mundane negotiations between businesses and business people.... This Court follows the sound reasoning of the Court in *Knapp* and rules that § 3.16 is inapplicable to the case at bar.").

Harvard Pilgrim's reading of these cases, especially the *New England Dental,* is not unreasonable. Nevertheless, using *Knapp* to support an argument that section 3.16(3) never applies to a case brought pursuant to Mass. Gen. Laws ch. 93A, § 11 is an overly broad interpretation of the language in two cases.

Undergirding *Knapp* and *New England Dental* is a belief that the disclosure aspects of the regulations in question were promulgated to heighten protection of consumers who may not be attuned to the harsh practices of the business world. *See* Mass. Regs.Code tit. 940, §§ 3.08(2), 3.16(2). This is not the case at hand. The subsection of the Code of Massachusetts Regulations, title 940, section 3.16(3), sub-

sumes substantive violation of laws and regulations within the definition of what acts or practices violate 93A. There is no reason to assume that this particular subsection ought not apply to claims brought pursuant to section 11 as well as to claims brought pursuant to section 9. This does not hold businesses to a higher standard of conduct out of concern for consumers, it holds them to a standard of *lawfulness.* This is distinguishable from the regulations requiring the heightened disclosures at issue in the two cases cited by the Defendants. *See Commonwealth v. Source One Assoc.,* 436 Mass. 118, 123, 763 N.E.2d 42 (2002) (citing section 3.16(3)-(4) and noting the trial judge's observation that "unfair and deceptive acts have come to embrace conduct that 'fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof.' ").[14]

True, there are a series of cases that hold that a violation of Mass. Gen. Laws ch. 176D is not a per se violation of chapter 93A, § 11. These cases, however, involve the unfair claims settlement procedures of chapter 176D § 3(9). *Brazas Sporting Arms, Inc. v. American Empire Surplus Ins. Co.,* 220 F.3d 1, 9 (1st Cir. 2000) ("a violation of chapter 176D is not automatically actionable under chapter 93A, § 11, .... That said, conduct that violates ch. 176D may independently be an unfair trade practice under Chapter 93A, § 11," citing *Kiewit Constr. Co. v. Westchester Fire Ins. Co.,* 878 F.Supp. 298, 301–02 (D.Mass.1995)).

---

**14.** It is perhaps noteworthy that, in *Knapp,* the Supreme Judicial Court based its holding on the fact that the regulation that had been violated was promulgated prior to the passage of chapter 93A, § 11, and therefore did not contemplate disclosure disputes between to

two business entities. The Any Willing Provider Law, of course, was enacted to take its place on a legal landscape that included both chapter 93A, § 11 and the long-standing Code of Massachusetts Regulation, title 940, section 3.16.

This Court has previously noted that *Kiewit* does not bar recovery. *M. DeMatteo Constr. Co. v. Century Indemnity Co.,* 182 F.Supp.2d 146, 162 (D.Mass.2001). "[To say that] Section 11 of 93A does not incorporate 176D is not to say that *conduct* that happens to violate 176D may never be 'unfair or deceptive within the meaning of Section 2 of 93A, and, thus, actionable under Section 11.'" *Id.; See also, R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.,* 435 Mass. 66, 78, 754 N.E.2d 668 (2001) (holding that the trial judge could rely on violations of chapter 176D, section 3(9) as 'persuasive evidence' that the defendant wilfully or knowingly engaged in unfair business practices proscribed by chapter 93A). There is ample such evidence here.

### 2. Unfair and deceptive practices as Violating Chapter 93A.

■ This Court need not, however, get overly enmeshed in the interrelationship between a violation of the Any Willing Provider Law and Chapter 93A, § 11, since the conduct of the Defendants here fell to a level of "rascality" that constituted unfair trade practices prohibited by Chapter 93A, § 11.

The goal of the arrangement between CVS, PharmaCare and Harvard Pilgrim was to ensure that, despite the Any Willing Provider Law, CVS maintained its market share in order to give Harvard Pilgrim lower rates. To accomplish this, the Defendants had to come up with a plan that would discourage competition, while still maintaining profits for CVS, and purporting to comply, at least on the face of the agreement, with the Any Willing Provider Law.

The Defendants argue that the Independent Pharmacies have failed to show that Harvard Pilgrim acted in bad faith. In support of this argument, the Defendants consistently focus on the lack of economic motivation underlying Harvard Pilgrim's alleged role in circumventing the Any Willing Provider Law. *See, e.g.,* Defs.' Mem. at 17, ("Harvard Pilgrim had no incentive to eliminate the plaintiffs from the marketplace."). It is clear, however, that Harvard Pilgrim believed that the arrangement, which effectively circumvented the mandate of the Any Willing Provider Law, would be in its financial interest.

Several of the Defendants' actions in creating the "open network" were unfair business practices under Chapter 93A. One principle of the Any Willing Provider Law was to level out the playing field for contracting parties with differing bargaining power. Here the three Defendants used their position to make it appear there was fair and open dealing, while in actuality, CVS was given one advantage after another.

The idea that non-CVS pharmacies were treated the same as CVS by either PharmaCare or Harvard Pilgrim is simply not supported by the record. First, CVS was a participant in the negotiations between PharmaCare and Harvard Pilgrim. Though this in itself perhaps would not violate Mass Gen. Laws. ch. 93A, § 11, and does not appear to violate the Any Willing Provider Act, it did allow CVS access to information to help it determine the level of reimbursement to which it economically could agree. PharmaCare analyzed the Harvard Pilgrim claims history in order to calculate a flat rate that would be acceptable. *See* Pls.' Ex. 1, (Buckley Dep. at 118–122; Weishar Dep. at 11–12). CVS approved the reimbursement rate prior to the letter that opened up the network. Pls.' Ex. 1, (Weishar Dep. at 58–59).

The non-CVS pharmacies were not given access to this information. Pls.' Supplemental Ex. 1, (Grossman Dep. at 303–08;

Leary Dep. at 54–58); *see* Pls.' Ex. 1, (Weishar Dep. at 21–24). Once the pharmacies were invited to join the network, they had to make the decision whether $29.70 was a reasonable or profitable reimbursement without any information as to what the mix of pharmaceuticals might be. Pls.' Ex. 1,(Weishar Dep. at 23–24); *see* Pls.' Supplemental Ex. 1, (Grossman Dep. at 303–08; Leary Dep. at 54–58).

A difference between the typical percentage of Average Wholesale Price form of reimbursement and the "flat fee per RX" form of reimbursement used by PharmaCare lies in the risks that a pharmacy faces through participation. *See* Pls.' Supplemental Ex. 1, (Harris Dep. Vol. I at 47–48). The Defendants' expert Dr. Harris, offered a simplified example of how the capitated reimbursement works:

> [If] a store knew that all of its customers only bought penicillin which sells for $5, or something, per script .... Well, in that world, $29.70 provides a big return.

By contrast—and this is before it went over-the-counter, but my memory is Prilosec was selling for something close to $100.... If all your customers had some type of drug such as ... Prilosec at $100, well, then $29.70 wouldn't cover your costs.

So now what I mean by "mix" is making believe those are the only two pharmaceuticals in the world, you'd want to know how much of penicillin you had and how much Prilosec you had; and depending on what mix was, "mix" meaning percentages of each, the $29.70 might cover the cost or it might not. It just depends.

*Id.*

This description clarifies the importance of information to a pharmacy in determining what rate will be profitable, or even feasible. Thanks to PharmaCare, CVS was privy to this information. The Independent Pharmacies were not. CVS used this information in order to ensure low participation by other pharmacies.[15]

---

15. The Independent Pharmacies further allege that PharmaCare and CVS misused confidential information after other pharmacies began servicing Harvard Pilgrim insureds. Pls.' Opp'n at 7–8. In support of this allegation, the Independent Pharmacies point to three documents. The first is a document prepared by PharmaCare in order to ascertain "the market share shift on a weekly basis due to the [opening of the network]." Pls.' Ex. 39, (Memoranda regarding MA RXNetwork Analysis for Harvard Pilgrim Health Care). These weekly reports are accompanied by a cover letter summarizing CVS's loss or gain of claims and dollars. *Id.* Part of the analysis includes bar graphs comparing CVS's current market share for that week with its market share since the network opened and with a baseline made up of CVS's market share from January 1, 1998 to March 15, 1998. *Id.* The next document is a "Harvard Pilgrim Market Share Update" prepared by CVS. Pls.' Ex. 40. This document compares pharmacies' market shares by zip code where the CVS share of Harvard Pilgrim prescriptions had fallen below 80%. *Id.* The cover memorandum notes that "market share loss can be tracked to specific competitors." *Id.* The final document is the "Findings From a study to Assess CVS' Pharmacy Service Performance During the Opening of HPHC," dated May, 1998. Pls.' Ex. 41.

It would egregiously violate Chapter 93A, § 11 had PharmaCare provided CVS confidential information it obtained from non-CVS pharmacies in its role as PBM. One wonders why PharmaCare went to the expense to analyze the weekly effect of the "open" network on CVS if it was acting as the PBM of an open network in which all pharmacies were on equal footing. Nevertheless, based on this record, it would be speculation for the Court to hold that the reports compiled by CVS were based upon information it received from PharmaCare. The Court is, therefore, not persuaded by a fair preponderance of the evidence that confidential information was interchanged between PharmaCare and CVS.

Reviewing the PharmaCare–Harvard Pilgrim agreement itself, as amended, the Court finds that non-CVS pharmacies were not granted a level playing field. As a functional matter, this entire deal was intended to, and did, (1) continue the Harvard Pilgrim–CVS preexisting relationship, (2) insure the largest portion of income stream from Harvard Pilgrim continued to flow to CVS, (3) place PharmaCare in a hopelessly conflicted position and overpay it for the services it performed so CVS could benefit therefrom, and (4) discourage the participation of non-CVS pharmacies. Indeed, in the Second Amendment, the contract between PharmaCare and Harvard Pilgrim specified that the agreement was contingent on CVS maintaining an 80% market share, a benefit not attributed to any other pharmacy. Pls.' Ex. 10. This Court therefore concludes, based on the record before it, that the concerted conduct of the Defendants was "unfair and deceptive" and constituted a violation of Mass. Gen. Laws ch. 93A, § 11.

### 3. Loss of money or property

▮ Inquiry does not end here, however. In order to succeed on their Chapter 93A claim, the Independent Pharmacies have the burden not only of showing that acts were unfair or deceptive, but also that each individual plaintiff suffered a "loss of money or property." Mass. Gen. Laws ch. 93A, § 11. In addition, each individual plaintiff must show that the loss of money or property stems from the Defendants' unfair or deceptive acts. *See Lyle Richards Int'l, Ltd. v. Ashworth*, 132 F.3d 111, 115 (1st Cir.1997) (noting that loss of money or property under § 11 must stem from deceptive act).

The Defendants argue that Brooks, Walgreens, and Stop & Shop had a greater profit margin than CVS. Defs.' Mem. at 18. In support they point to a reimbursement summary for the month of June 1998.

Defs.' Ex. 16, (HPHC CAP Chain Reimbursement Summary). According to the summary (which makes no reference to Walgreens, but rather referred to Brooks, Stop & Shop, and Osco), these three pharmacy chains were achieving a higher profit margin rate as a result of dispensing a greater percentage of generic prescriptions as opposed to brand name prescriptions. *Id.* Of course, within this summary it is also clear that the total claims by Brooks, Osco, and Stop & Shop combined are less than 10% of the total claims submitted by CVS. *Id.* Moreover, this summary does not include the Harvard Pilgrim payments to PharmaCare that allowed CVS to maintain a low reimbursement rate while diminishing competition. *See id.* Recognizing that Harvard Pilgrim's wholesale pharmaceutical costs are independently variable, this Court finds that but for the agreement between CVS, PharmaCare, and Harvard Pilgrim in their attempt to maintain a relationship prohibited by the Any Willing Provider Law, the reimbursement rate to the PBM would have been lower. Given the funds Harvard Pilgrim was willing to pay during this period, there would have been increased funds on the table for equal pharmacy reimbursement. It is therefore reasonable to infer that the non-CVS pharmacies would have enjoyed higher revenues, at least until increasing wholesale pharmaceutical costs squeezed out those revenues. Indeed, the Mercer Report Harvard Pilgrim commissioned shows that PharmaCare was by far the most expensive of those PBMs that were evaluated. Pls.' Ex. 29.

The amount paid to PharmaCare included its compensation as well as the monies paid to reimburse the pharmacies. *See* Pls.' Ex. 9. During the years the Harvard Pilgrim—PharmaCare agreement was in effect, that total represents the amount

that Harvard Pilgrim was willing and prepared to pay. In violation of the Any Willing Provider Law, PharmaCare, in collusion with Harvard Pilgrim and CVS, was knowingly overpaid for the benefit of its parent, CVS.[16] The Independent Pharma-

**16.** By now, this Court is experiencing a terrible sinking feeling about our profession. I consider the Massachusetts Bar one of the most professional, highly ethical, well trained, and robustly intellectually creative band of lawyers and advocates in America. I have been quick to point out superb lawyering in legal opinions wherever appropriate. *See Freeman v. United States*, 284 F.Supp.2d 217, 228 (D.Mass.2003) (Daniel O'Connell); *Conley v. United States*, 332 F.Supp.2d 302, 316 (D.Mass.2004) appeal pending (Willie Davis).

Where were the lawyers here? Harvard Pilgrim is one of Massachusetts leading HMOs and CVS one of its foremost retail pharmacy chains. Surely lawyers must have been in on this deal at its inception. Yet no fair minded lawyer reading the Any Willing Provider Law could have countenanced placing PharmaCare in this hopelessly conflicted position and thought they were doing aught but attempting an end run around the law. Of course Harvard Pilgrim and CVS didn't like the Any Willing Provider Law and, as is their democratic right, no doubt lobbied vigorously against its passage. Harvard Pilgrim must consider the law misguided public policy.

They lost.

Our democratically elected legislature enacted the law anyway. The Defendants' conduct thereafter has demonstrated a disdain for democracy that is almost palpable. Was there no lawyer on either side who cautioned against this rather blatant attempt to frustrate the legislative will? There should have been. The conduct of the lawyers who vetted this deal was "too slick by half." *Federal Refinance Co., Inc. v. Klock*, 229 F.Supp.2d 26, 29 n. 2 (D.Mass.2002) rev'd on other grounds 352 F.3d 16 (1st Cir.2003). What is clear is that these parties paid someone good money for sharp practice. In this post-Enron world, the independent directors have a duty to investigate and determine how this could have happened. In undertaking this investigation, they could do worse than consider that:

The ideal of moral character resonates profoundly with Americans, but it is not clearly understood or always put into practice. We reside in a performance culture where results have become more treasured than virtue, recognition more sacred than modesty. No one justifies the lack of character in our superstars, but there are some other larger forces at work. Could it be that the culture we have fashioned has inadvertently sanctioned our day of expedient virtue? ....

Ours is a culture where winning and success has become sacrosanct. We are livid at our executives when they break their trust. But we (more than 50 percent of Americans own public stock) were more than fine with CEOs living large during the boom as long as they kept propping up share price so we too might cash in ....

Character has always required a reality bigger than oneself—a reality that impinges upon us from the outside. Such a reality is immune from our manipulation and dictates the boundaries of our life. Absent such restraint, pragmatism governs our leaders, for when reality becomes no bigger than the desires and dreams of individuals, personal survival and pleasure becomes the only true god. Character is irrelevant today not because people want it to be, or don't have enough role models to emulate. It is irrelevant because the concept of character is just that—a disembodied concept.

Character has been undercut by ... the difficulty in distinguishing between image and substance, and the repeated moral failings of leaders. We look for flamboyance, not deep-rooted virtue. The result is cynicism. Trustworthy leadership cannot flourish where people no longer know how to trust.

So, here is the tragedy of our times. We desperately need the very qualities we are extinguishing. Some belittle the many understated models of character[ ] around us: promise-keepers, intentional parents, or the many role models in sport and business who do serve. We desire character, but, as a culture that doesn't reward or value it, we seek instead something more comfortable and utilitarian. Character succumbs to pragmatism. We recognize and exalt the former, but enjoy and practice the latter.

To have a renewal of character is to demand a culture that constrains, limits, binds, and obligates. The price ... may be simply too high for some [of] us to pay. Some water down any moral tradition that

cies have thus met their burden that they have suffered a loss of money or property and that the loss of money or property stems from the Defendants' unfair or deceptive acts as to the class claim.

 The individual pharmacies that are not members of the class, J.E. Pierce, Sutherland Pharmacy, and Medfield Pharmacy, face a different dilemma. They have not offered sufficient evidence to persuade the Court they were harmed by their exclusion from the Harvard Pilgrim network.[17] Nor does the competitive bidding violation of the Any Willing Provider Law translate, as to them, into a violation of Mass. Gen. Laws ch. 93A, § 11. While the competitive bidding requirement implements a fairness and consumer protection policy of the Massachusetts legislature, the economic harm from this violation is simply too evanescent to satisfy the "loss of money or property" requirement of Chapter 93A, § 11. As to J.E. Pierce, Sutherland Pharmacy, and Medfield Pharmacy, judgment shall therefore enter for the Defendants.

## IV. AWARD OF DAMAGES—AND A COOLING OFF PERIOD

Although all parties have submitted damages data to address the "loss of money or property" issue, they have each reserved the right to present live evidence on that issue should the Court find, as it has, that the class action Independent Pharmacies are so entitled. The Court honors that reservation.

 To guide the parties in preparing for that hearing, the Court rules that the class action Independent Pharmacies

are entitled to compensatory damages measured by the difference between what PharmaCare was actually paid for its services from March 17, 1998 until it was replaced by MedImpact and the average amount that PBMs in this market were being paid for these services during the same time period. Due to the wilful conduct of the Defendants, these damages shall be trebled. Mass. Gen. Laws ch. 93A, § 11. As a matter of equity, however, in light of Harvard Pilgrim already having wilfully overpaid PharmaCare (and thus having violated chapter 93A, § 11), the damages assessed shall be recovered in this order from (1) PharmaCare, (2) CVS, and only then from Harvard Pilgrim.

The Independent Pharmacies may also submit a petition for reasonable attorney fees which may be recovered from all the Defendants jointly and severally.

These parties have been engaged in active settlement negotiations which, unfortunately, have subsided awaiting this Court's decision. Now that decision has been rendered, providence dictates a 30 day cooling off period to see whether the matter can be resolved through private ordering.

## V. ORDER

For the reasons stated, the Court ALLOWS the Defendants' Motion for Summary Judgment as to J.E. Pierce, Sutherland Pharmacy, and Medfield Pharmacy but otherwise DENIES that motion, ALLOWS partial summary judgment for the class action Independent Pharmacies as to liability, and orders the case administratively closed. It may be reopened upon

---

frustrates their insatiable appetite for consumerism and performance. Then they fail to properly honor the models providing seeds of hope for renewal.
Les T. Csorba, *The Death of Character,* The Boston Globe, Dec. 22, 2004 at A17.

17. Any claims by Meetinghouse Pharmacy that fall beyond those described in the class certification fail on this deficiency as well.

the motion of any party at the expiration of thirty days for either the filing of settlement documents or the assessment of damages.

SO ORDERED.